Good morning, Your Honors. My name is Arthur Miller. I'm appearing for the class of caddies. I apologize. I am under the weather. If I sneeze or cough, it is no sign of disrespect. Blame it on the smoke. I believe we have reserved two minutes for rebuttal. I will discuss what we believe are two fundamental procedural errors made below. Mr. Major, my colleague, will turn to the antitrust and duress and substantive elements. The first difficulty with the proceedings below may seem technical. We believe that there has been a violation of the requirement in Federal Rule 12d that on receipt of material outside the complaint that is accepted, the motion automatically is converted into a summary judgment motion with full procedural protection in terms of notice and discovery opportunities. That was not done when, curiously, in context, the district judge called for information outside the complaint. Part of his request dealt with an issue of law, namely what was the governing law. That's not the point. The point is he — As the tour points out, though, the trial court judge did expressly state that he wasn't relying on any of that information outside the complaint. It was relying solely on the allegations in the complaint that this had been going on for years and years. The difficulty with that construction, however, Your Honor, is that when you look at the judge's opinion, he first says there are two ways to read the contract. That in and of itself should have stopped discussion with regard to the survivability of the contract claim because there is precedent both in California, whose substantive contract law controls, and here in the Ninth Circuit that when you have alternative constructions of a contract, the case must proceed. But he did not stop there. He said, despite these two constructions, I can decide this based on context. And there he steps beyond the complaint. What context is he talking of? Well, the only thing he cites is to the supplemental brief put in as part of the response to his questions. He quite clearly relied on that, which allegedly admits that the bib has been required for many, many years, something that is not in the complaint. The problem here is that although this is technical Rule 12d, and some of us live and die according to the federal rules, not everybody, one of the protections of the rule is that if you're going to step outside the complaint, you have got to do it 360 degrees or you have an imbalance in terms of the information available and the display made to the judge. The caddies have no information on the two questions he asked. Let me ask you a question that may seem technical to you, but I'm having a hard time understanding the breach of contract claim. Is your argument that the contract prohibits the tour from requiring bibs or that the contract doesn't clearly require the caddies to wear it? The latter, Your Honor. And therein lies one of the problems here. The word bib is not anywhere. It's uniform. When was this clause put into what is a registration agreement, not really a contract, sign it or don't caddy? When did uniform come in? What was the intention of the parties in using uniform? If that's the case, and let me get to my technical point, you allege a breach of contract. I mean, it sounds to me like what should have been brought is a declaratory judgment action asking for a ruling that it would not be a breach of contract for the caddies to refuse to wear bibs because you have to allege that the tour actually breached the contract. So is there anything in the contract that says the tour won't require bibs? No. The requirement of a bib, even if one assumes it goes back in history, if it goes back to the 50s, you have a bib that is basically a bib. It's just a little garment. It's gone through a half dozen different iterations. First it has the name of the golfer, then it has the golfer's number, then it has the St. Louis Open or San Diego Open, and then it starts having Coca-Cola, it starts having Michelob. Now, if uniform went in in the 50s and the 60s and the 70s, no one was thinking about endorsements. There were no endorsements in the golf market. There basically was no television. But you're still not answering my question about why wouldn't this have been more appropriately a DJ action? I cannot answer that question. That's a procedural choice that simply was not made. It does not undercut the vitality or validity of an affirmative action for breach of contract because you are using this contract to make us do something we are not obliged by the contract to do. And in the process of doing that, you are committing all of these other tortious acts. You are subjecting us to duress, to coercion. You are stealing our name, image, likeness, etc., etc., etc. It all flows from the contract, but probably most significantly for purposes of the procedural position we are now in. The good judge says, well, there's an admission, which is part of a statute of limitations argument below. The bib has been required for many, many years, even though it wasn't an advertising bib. The bib... My question is, I thought you said earlier that it was not a contract. Is it not a contract? And if it's not a contract, isn't the suit claimed a breach of contract that doesn't exist? Well, it is a contract in a sense, Your Honor. It is a registration form in which the caddies agree to abide by certain regulations. One of the regulations is this uniform, which in 1957, if that's the magic year, we do not know. Now, what I'm trying to find out is, if you say it's not a contract, how can there be a breach of contract claim? Well, then it converts itself into something in the nature of an unjust enrichment, a quasi-quantum merit argument, a misappropriation argument, because, as we colorfully point out, the bib, which is now more like an apron than a baby's bib, the bib is making the caddy a walking advertisement for the tour, for the sponsor of the tour, the host, and for other companies, and all of that revenue is going to the tour. None of it is going to the caddies. But don't you have to pick between a contract claim and an equitable claim? At the pleading stage, I don't believe so. The rules permit alternative hypothetical and alternative pleading, and we're only at the 12b-6 point in what frankly appears to me to be a subject, a summary judgment decision. Was there any — was this the first complaint? Was there any effort to amend? Did the district court offer an opportunity to amend the complaint, or was it dismissed with prejudice? It was dismissed with prejudice, which is one of the reasons I think it looks like summary judgment. The problem is this word plausibility, which is part of the jurisprudence on a motion to dismiss and is part of the jurisprudence on the summary judgment motion. And I think it's just become a ball of wax. But procedurally, the judge below acted as if it was summary judgment. He did not read the complaint in the light most favorable to the plaintiff. He did not draw inferences for the plaintiff, et cetera, et cetera, et cetera. I see my time is moving, and I — How much time did you plan on giving your co-counsel? He was going to do it at 7. We'll give you 7, though. Would you put 7 on the clock, please? Ben Major for the appellants. Good morning, and thank you all for your time today. I'm going to shift to the antitrust claims because that's a claim and cause of action that can't be remedied by a simple revision to these guidelines or contracts. Now, what we have overarching these markets that we've been talking about are professional golf tournaments. Now, these professional golf tournaments are the product of a concerted effort. You have the local hosts, and you have the tour, who are the co-organizers of these tournaments. But we all know what the fans come to watch. They come to watch the golf competition, which, of course, is put on by the players, who are assisted by their employees, the caddies. Now, these professional golf tournaments create a sub-market or a derivative market for advertising to golf fans. That market is what provides the basis for our antitrust claims. But you're trying to narrow the market even farther than that. I mean, unlike the University of Oklahoma case where the Supreme Court differentiated between or said it was okay to differentiate between sports or categories of sports, you're trying to narrow it so far down that you're talking about only the TV portion of the live tournament advertising. That's correct. Isn't that, you know, cutting it a little fine? No, Your Honor, it's not. And I think we have support in both our allegations and in case law. And if I may, I'll just briefly discuss the case law a bit. The Eastman-Kodak case from the Supreme Court narrowed it much farther than what we're trying to narrow the market. In that case, they approved a market that was for the service and parts of a single-brand copier. A very similar result was handed down by the Ninth Circuit in the New Cal case that we cite. That case involved these long-term leases for copying equipment. Well, Eastman-Kodak wasn't a Section 2 claim, was it? It was a tying claim, right? Correct. Correct. Well, we have also alleged a tying claim, Section 1 claims, and a Section 2 claim. We're talking about the relevant market under Section 2. Well, you have to define a relevant market for purposes of Section 1 or the Section 2. So that's why we played it as we did. And you can define it differently depending on which section you're looking at, correct? You could. It depends on, I think, what the evidence reveals and what the facts wind up being. If we were to agree that at least at this stage it's too soon to define the market precisely, would we go on to consider all of the alternative arguments that you all spend so much time briefing? The alternative arguments with respect to market definition or with respect to? With respect to the aspects, a variety of aspects of the antitrust claims. Well, the district court dismissed our antitrust claims solely on the market definition issue. So I would think that once you find that we've adequately pled the market definition, which under the NewCal case we're not supposed to have to plead with specificity, even though we have, I think that you can remand this case, at least for the purposes of the antitrust claim. Okay. But you joined. I mean, there's full joinder on a variety of the other issues in your briefing. You didn't say we shouldn't get to those. Right. Well, each of our claims, the reason we addressed the other elements of the antitrust claim was just to cover the bases due to de novo review and the standard of review to make sure that the court understood that we did properly plead the other elements of our claims. And also the district court dismissed all of our claims, so we had to certainly demonstrate that we properly pled those claims as well. I think the key thing that occurred in the district court that we should address here is the case law cited by the tour with purposes of market definition. Now, the plaintiffs in those cases just failed to answer the why question. It may seem perplexing that the advertisers or the advertisement opportunities in our market are not reasonably interchangeable with advertising opportunities such as magazine ads and television commercials. But we have answered the why question that the plaintiffs and the tours authority failed to answer. And that question here is, why are our advertising products in our market not reasonably interchangeable with these other markets? And the answer, there are several answers that we pled. First, we specifically alleged that if you had an actual monopolist or a hypothetical monopolist in either of our markets, they could increase the price of advertising products in our market by 10 percent. And they could do so profitably. And the reason they could do so profitably is because it wouldn't send a large amount of demand for advertisement in our market over to the television commercials and magazine ads. Something else we emphasized in our complaint was the unique price flexibility offered in our market. Well, if you want to advertise on a national television commercial or a national magazine ad, the baseline price is pretty high to do that. But if you want to market, we have to assume that our market is a free market, which it's not right now. But if you have a low marketing budget, a small marketing budget, you could hire a few low-ranking caddies or a few low-ranking players on the web.com tour to wear your cap, to put their logo on your bib, or to use your product during the tournament. And that would be viewed by hundreds of thousands of fans who are showing up for the tournament. It would be viewed by the television audience when the camera pans to those players and our caddies. So we have this unique price flexibility. On the other end of the spectrum, for our market, if you have a large advertising budget, you can be a title sponsor and you can be on the PGA Tours website. You can be on ESPN. You can have your name everywhere on the scoreboard and on placards and signs around the course. And finally, before I run out of time, we really stress the importance of product placement here. Unlike a television commercial or a magazine ad, you can't really ignore the advertising products in our market. And I think the best example of product placement advertising and why it's so valuable is the E.T. movie with the Reese's Pieces. Before E.T. came out, Reese's Pieces was a little-known candy. Hershey pays a million dollars for advertising, and Reese's Pieces becomes a sensation overnight. I'm out of time. I appreciate it. And for these reasons, we respectfully ask that you reverse and remand this case. Thank you, Counsel. May it please the Court, my name is Jeffrey Mishkin from the firm of Skadden, Arp, Slate, Marr & Flom. I represent the PGA Tour. Your Honors, the very premise of this case is that the caddies have some sort of fundamental right to participate in PGA Tour events on terms and conditions of their own choosing. They do not have that fundamental right. The caddies did not create these events. The PGA Tour, as the creator, organizer, and promoter of the event, has the right to establish the terms and conditions for participation. Everybody who would like access to the PGA Tour event or any major sporting event or entertainment event always has to abide by the terms and conditions of the entity putting on that event. Is it your position that the contracts require use of bibs or the contracts permit the use of bibs? The contracts require that the caddies wear a uniform prescribed by the PGA Tour and the host organization. That prescription of a uniform Where is that? It is in the caddy registration and regulation agreement, Your Honor. But it doesn't mention bibs at all, correct? It doesn't mention bibs. Whatever uniform is prescribed historically and for 60 years of unbroken practice between these four. Aside from that, which is that we can come to separately, but where does the contract prescribe that they must have endorsements, wear a bib with endorsements? It doesn't, Your Honor. It says in the caddy registration and regulation agreement that each caddy must sign before every tournament. The numbered paragraph 2, it's at page the excerpt of the record, second volume, page 232. That reads, caddies shall wear uniforms and identification badges as prescribed by the host tournament and PGA Tour. Does that mean you have to wear an endorsement? It says you have to wear the uniform prescribed. In this case, the uniform prescribed, as many, many uniforms prescribed in sports, has a logo. It has the name of the golfer for whom the caddy is working, and it also has the name of the title sponsor of the tournament. So do you believe that if a caddy says, I'm not going to wear a bib with the advertisement on it, I'll wear the bib with the golfer's name, but I'm not going to wear an advertisement, that that caddy breaches the contract? He would be denied access, Your Honor. This is a condition of access. And the reason he's denied access is because you believe he has signed a contract to wear the uniform prescribed by the PGA Tour, which for 60 years has been the bib. There's no dispute here, Your Honor, that the only uniform— You're talking about the supplementary information, right? About the 60 years. All right. That's a separate question. But as to the registration form itself, it's very detailed about the kind of uniform you can wear. It's solid-colored, khaki-style long pants, top of the shoe, T-shirts, acceptable colors, nothing about wearing an advertisement for a commercial purpose. Your Honor, the portion that you're reading, I would not describe— That's Section 2. That's the one you identified. Yes, the second sentence. But that second sentence has to do with a dress code, not with a uniform. The first sentence says you have to wear the uniform prescribed and identification badges. The second sentence describes a dress code because this bib still requires the caddies to get dressed. They have to wear pants and a shirt. The bib is not going to cover everything. It's not a full uniform. So you think the contract could allow you to say you have to wear a clown outfit, or we could deny you access, and that's completely authoritative? It could, Your Honor. I doubt the PGA Tour would shoot itself in the foot so vigorously, but it could. Or a sandwich board. Or a sandwich board. I suppose they could, Your Honor. But the PGA Tour, for a long time, has been trying to put on events that are attractive to its sponsors, to its fans, and it has not acted in a way that is in any way unreasonable or silly. It has simply tried to put on the best events that it could. Well, events are fine, but forcing individuals to wear advertisements for commercial companies is different from putting on an attractive event. It would seem to me with all the specific details you give about their outfits and what they must wear, and even a uniform, it doesn't mean you have to wear a placard with a commercial advertisement. It could have been very easy to put in here a uniform, including advertisements, or including a bib, or whatever it is. All right. Now, that may go to the question of whether the contract is ambiguous, rather than... But that is one of the issues, is it an ambiguous contract? When it fails to give such detail, but fails to mention the most important thing, that you're going to become a walking advertisement for Coca-Cola, or whatever it is, Amazon, or whatever. With all the detail you give about what the caddies have to wear, and the failure to mention that, may make the contract ambiguous. Your Honor, I don't think the contract is ambiguous at all on its face. But one of the ways in which you judge plausibility of an interpretation of a contract would be to look at the practice of the parties, if that's not disputed. Here, it's not disputed. Okay. But that goes to the second issue. Well, I... One is what the contract says. Indeed. And two is the second issue of what the practice was, which is done by taking judicial notice of certain facts. Judicial notice here, because the parties, the plaintiff conceded that for 60 years, there's been this unbroken practice of requiring caddies to wear bibs with commercial sponsors on it, for 60 years. We don't know what the contract said during those 60 years, or what the discussions were between the parties, or whether they said, look, we know we can't force you to do it, but we'd like you to do it. And they said, well, okay, we'll do it. But there's no obligation. I mean, those are all possibilities if you had a real summary judgment. They're possibilities, Your Honor. But the record here goes back to 2010, at least. The language has not changed at all. I believe it goes back a lot further. But what's in this record is from 2010 on. Well, my guess is your position has to be that history doesn't matter. That, in fact, if the PGA had the right to require this at any point in time. It bolsters your argument, but it's contractual, at least. Absolutely right. And the breach of contract. Absolutely right, Judge Thomas. They could change it tomorrow. So what's the present purpose of the bib other than advertisement? Well, partly it's identification. Partly it's a uniform look with the name of the golfer and the name of the tournament. But let's obviously, it does provide a promotional opportunity for the title sponsor of the event, and I would say a well-deserved opportunity for that promotion. The title sponsor, of course, makes the event possible. The title sponsor agrees to pay all the prize money. That's how the caddies get paid. That's how the golfers get paid, and the golfers give a portion of it. The golfers don't have to do this, do they? No, they do not. They have a dress code, but they don't have a uniform requirement. The caddies do. On the process issue, once the trial court found an ambiguity, shouldn't the trial court have converted this into a motion for summary judgment? If there was an actual ambiguity and the trial court was concerned at first, and I think he and I had an exchange about that, he asked pretty much the same question Judge Reinhart did, which is, well, maybe the second sentence is really just telling you what the uniform policy is. And I said, well, in sports, it's very common for there to be both a uniform requirement and a dress code, because not every single last item of apparel is part of the uniform.  And I don't think there was any argument that there was neither. No. You need evidence in the record of all of this, right? No. This was just why he thought there might be, at first, and he came around to see it, that there was no ambiguity here, because those two sentences were talking about something completely different. He thought they were talking about the same thing, but ultimately, he claimed he came to see that they were talking about sentence one was talking about a uniform requirement, sentence two was talking about a dress code. They're two different things, and there's very good reason why. But he came to see that based on evidence submitted outside the record, right? I mean, outside the face of the pleadings. Based on a concession that he was permitted to take into account by the plaintiffs, that that had been the practice, unbroken practice, for 60 years. But I think, and Your Honors can read this contract, as well as Judge Chabria did, as well as we can, and form your own conclusion. I think it is crystal clear. And if you understand, this is in a sports context. It is absolutely commonplace in sports for there to be, side by side, separate things, a uniform requirement, and then a dress code, because players, historically the sneakers are the best example. Sneakers are not part of the uniform. They have to be worn, and there's a dress code as to what color they can be and what material they can be, but that's up to the players to decide. It is not part of the uniform. So these two sentences are talking about two entirely different things, and I think that's clear on their face. The as Judge Thomas said, the history only backs this up. If we need to make it clearer, we'll make it clearer tomorrow. The PGA Tour has the right to establish reasonable terms and conditions for participation in their own events. They created the events. The caddies are there as invitees, as many other people. It doesn't matter whether you're a player, or a spectator, or a sponsor, or a host organization, a member of the media, or a caddy, you have to abide by the terms and conditions. It's a private event. Now, there are laws, of course, we can't violate, background laws, but in general, if you create and pay for and establish an event, you get to say what goes on at that event. If you want to do things that are not useful. Sotomayor, why didn't they just put in the agreement that you must wear a bib which can have commercial endorsements? You wouldn't have had any problem at all? Well, the PGA Tour can do that tomorrow, Your Honor. Oh, no? I don't think that's necessary here. What they've said is, more generally, but it would cover the bib, is you must wear the uniform we prescribe. What they prescribe is a uniform with the logo on it. And that prescription has been in effect for many, many years, unbroken, unchallenged, and unremarkable. It is not, at the end of the day, it is not a very serious imposition. Could you put on that bib, vote for Trump? That would pose a more difficult question, I think, on many levels. The Tour has not done that. Again, I think this is in the nature to that. Boy, that's a different debate, Your Honor. This is an identification, to a large extent, of what, again, who you're caddying for and what tournament you're playing at. So it's got, it serves that. Well, to a large extent, it's a commercial endorsement that I would suppose to most people is more important, including to you, than that the caddy identifies his name or whatever else it is. And it's also surprising to me that you want the caddy to do this, but not the players to do it. It seems like an odd, you know, if you really cared about endorsements, it would matter. It would be the players. I mean, people would be influenced more by the players than by what a caddy endorses. Your Honor, I think what we're trying to do here, balance a number of things. But this, the idea of this bib, and again, the practice has been so consistent for so many years, is to provide not an endorsement. That's really not what's going, I don't think anyone believes that when a patch on a uniform is displayed, whether it's, we say in our brief, from the Premier League to the Little League and now even the NBA, when a patch, a logo, commercial logo, is displayed on a required uniform, no one really believes that everybody on the field is endorsing the products of that company. It's simply an opportunity for the sponsor to get some promotion. Here, that's what's going on, certainly to an extent. And as I've said, I think it is a well-deserved promotion by the title sponsor, given that they're paying the caddies, they're paying the players. Again, for many reasons, it would be a much more difficult proposition, I think, to impose a uniform requirement in golf, just given the history of that sport. On the antitrust claims, the, you know, at least the law in the Ninth Circuit is that you're supposed to define the market by reference to practical indicia. How do you figure out what all those practical indicia are without examining facts and circumstances and developing the record? Well, relevant market is a fact issue, Your Honor, if you get past the legal issue of the plausibility of the market. And the plausibility of the market is going to depend on whether or not the plaintiff has included all reasonable substitutes for the product at issue. This is, in the Newcal case, as Thomas wrote correctly, it's the law everywhere, that relevant markets are not defined by consumer preference, not defined by what consumers want. Some consumers only want a Mercedes. They'll never buy any other car. That doesn't mean that Mercedes is a market in and of itself. It has competition. A fact of interchangeability. Yes. That has to be assessed. How do you make that determination on the face of a complaint? Well, I think the Iqbal and Twombly line of cases, which imposes a serious obligation on the part of the district court to serve as a gatekeeper, and this is one of the areas, and again, Newcal speaks to it, that you have to make a plausibility determination. And many, many, many cases make this plausibility determination that a relevant market is not plausible, is not viable when it leaves out obvious alternatives. I mean, the suggestion here that if you want to reach golf fans and will limit it to golf fans, or as they put it, older white males who like golf but will click through a commercial and not, you know, look at an ad in a magazine, there are so many obvious alternatives to advertising on the clothing of a golfer or a caddy. They're innumerable. And Judge Chabria listed some of them. And that makes the market not plausible if you leave out all those obvious substitutes. And by a substitute, it's a question of whether there's cross-elasticity of demand. If the cost of a advertising on the clothing of a caddy or a golfer became too expensive, the suggestion is the advertisers have no place else to go to reach golf fans. It's not plausible. It's beyond not plausible. And I think Judge Chabria said this is a market ---- And he did make a mistake in saying there has to be no potential price increase, right? No. Or price benefit. I mean, he went a little too far in his language. I don't recall this saying that at all, Your Honor, that there ---- so what he said was there has to be cross-elasticity of demand. But he said it has to have zero effect on demand. No. I don't believe he said that at all. Okay. He did. I mean, I think he later might have backed off, but he actually said that. No effect, it has to have no effect on demand. Well, on demand. The question is whether or not if one type of advertising, and I see I'm well over my time, I do apologize, if the price of advertising on the clothing of caddies or golfers became too expensive, would there be alternatives? That's the question. And he said clearly there would be. It's not about ---- it's, again, when you're dealing with this threshold question of plausibility of a market, you're not making the kind of economic assessment that you would make and was required in Newcal and other cases. You're making much more of the Iqbal and Twombly, judges have to use common sense and they have to use judicial experience, but they must exercise that gatekeeping function. And he did that here in a very easy case because it's so easy to imagine. The two advertisers that the plaintiffs choose to use here as examples in their complaint of corporate sponsors, Coke and Buick, it isn't plausible that Coke and Buick would have no alternatives to reach golf fans if they couldn't, if it became too expensive. That's a common sense point. It's not an economic point. And I think that's all that Judge Chabria was saying here. This market was so clearly made up, contorted, just to fit the needs of this litigation. That this was an easy call, that it did not pass the plausibility test. Therefore, under Iqbal and Twombly, it should be dismissed. Before you launch into, especially in antitrust cases, before you launch into discovery here, there has to be that gatekeeping function of deciding whether or not the market is plausible. Here, I think it was a pretty easy call. Thank you, counsel. I've seen my time. Thank you very much. Your Honor, are we adhesive to reserve 2.5 hours? No, no. Go ahead. We'll try to equalize the time. So would you put 4 minutes on the clock, please? I just want to address a few things that counsel said. First, Your Honor, you're correct that the judge dismissed our market definitions because he held that a pricing, that it's not plausible that a price increase would have no effect on the other market. And that's just simply not the standard. Secondly, market definition, and this has been repeated by the Supreme Court here in common sense issue. It is far from it. There have even been witnesses who work in a particular industry who have been struck, whose testimony has been struck because they weren't qualified to speak to market definition. So it is not a common sense issue. Also want to address this characterization of what the caddies are doing. Number one, the caddies are not suggesting, nor do they need to suggest, that they have a fundamental right to work. Now, we don't need to because just as in the NewCal case, someone doesn't have a fundamental right to work on GE copiers either, yet that was the market definition there. If you look at the O'Bannon case from the Northern District of California in the Ninth District, yet the college education market was the market definition there. So that's not the question whether we have a fundamental right. Also, the exchanges here today between counsel and you all has made a couple of things very clear. Number one, discovery is necessary in this case for several reasons. And under California law, California makes sense on that point because if you have an ambiguous contract, California law actually invites you to look at extrinsic evidence. California courts have held that whenever there's an ambiguity, it's not even a summary judgment issue most of the time. Further, California law requires us to construe ambiguities against the drafting party or if there's uncertainty created by some extrinsic fact, then we construe the contract against the party creating the uncertainty. Now, these contracts are not only relevant for our contract claims, they're mostly relevant to the consent issue, which of course bears on our right to likeness claim and our false Now, here, the uncertainties and the ambiguities were created by the tour. They drafted the agreement. They say that the bib is the uniform, yet they don't use the word bib in the contract. They include the uniform provision, but then they describe a dress code. As we have alleged during the course of time, if we are going to look at things beyond the contract, we have specifically alleged that throughout the years, there have been skirmishes or disagreements about the bib policy, and we have alleged that the tour has not justified the bib policy by pointing to the agreement or to the guidelines, that they have only relied on tradition. That's the way it always has been, and that's the way it's going to be. And just a final point, just because the tour and the local host are co-organizers of these hearings, doesn't mean that just because they issue or publish some guidelines, it doesn't avoid liability under the Antitrust Act. If we look at the NCAA cases, whether it's O'Bannon or Oklahoma University, those universities and those players had agreed to those guidelines, and still there was antitrust liability there. I'm out of time again. Thank you all for your time. Thank you for your arguments. The case just argued to be submitted for decision.
judges: Reinhardt, Thomas, O'Malley